DAVID ZARMI, State Bar No. 245636
ZARMI LAW
9194 West Olympic Boulevard, Suite 191
Beverly Hills, California 90212
Telephone: (310) 737-2736
Email: davidzarmi@gmail.com
Attorney for Petitioner Travis Edward Martin

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| TRAVIS EDWARD MARTIN,<br><br>Petitioner,<br><br>vs.<br><br>RAPHAEL ACEVEDO, Warden, Richard J. Donovan Correctional Facility,<br><br>Respondent. | ) | Case No. 2:25-cv-11643-SPG-ACCV<br><br>**FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY (28 U.S.C. § 2254); MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hon. Angela C. C. Viramontes<br>United States Magistrate Judge |

## TABLE OF CONTENTS

**PETITION**

I. JURISDICTION 1

II. CUSTODY, VENUE, AND THE JUDGMENT UNDER ATTACK 1

- A. Custody and Venue 1
- B. The Judgment 1

III. DIRECT APPEAL AND EXHAUSTION OF STATE REMEDIES 2

IV. TIMELINESS 5

V. FEDERAL PROCEDURAL HISTORY 5

VI. AMENDMENT AS OF COURSE, SUPERSESSION, AND RELATION BACK 6

VII. EFFECT ON THE PENDING MOTION TO DISMISS 7

VIII. STATEMENT OF FACTS 7

- A. Background 8
- B. The 2019 Statement and Two Years of Questioning 9
- C. The Financial Relationship Ends and Natalie Threatens Petitioner 10
- D. The November 2021 Disclosure and the Forensic Interview 11
- E. The Photographs 13
- F. The Evidence Code Section 1108 Evidence 14
- G. The CSAAS Testimony 15
- H. The Instruction and the Closing Arguments 18

I. The Investigation of the Blackmail Defense and the Walds' Gain 22

J. Deliberations and Verdict 23

IX. GROUNDS FOR RELIEF 23

A. Ground One: The Admission of the CSAAS Testimony and the CALCRIM No. 1193 Instruction, as Applied at Petitioner's Trial, Violated His Sixth and Fourteenth Amendment Rights to Due Process and a Fair Trial 24

B. Ground Two: The Prosecutor's Misstatement of the Section 1108 Evidence in Closing Argument Violated Petitioner's Fourteenth Amendment Right to Due Process 25

C. Ground Three: The Admission of the Evidence Code Section 1108 Propensity Evidence, as Applied at Petitioner's Trial, Violated His Sixth and Fourteenth Amendment Rights to Due Process and a Fair Trial 27

X. PRAYER FOR RELIEF 28

**MEMORANDUM OF POINTS AND AUTHORITIES**

I. INTRODUCTION 31

II. STANDARD OF REVIEW 32

III. GROUND ONE: THE CSAAS TESTIMONY AND CALCRIM NO. 1193, AS APPLIED, RENDERED THE TRIAL FUNDAMENTALLY UNFAIR 33

A. Payne Is Clearly Established Law After Andrew v. White 33

B. The State Court Overlooked the Federal Claim, So Review Is De Novo, and Its Ruling Was Unreasonable in Any Event 34

C. As Applied, the Evidence and the Instruction Operated as Proof of Guilt on the Only Contested Issue 36

D. Brodit and the Cases That Follow It Do Not Control 40

E. The Scientific Literature Confirms the Prejudice 42

F. Preserved Alternative Argument 45

IV. GROUND TWO: THE PROSECUTOR'S MISSTATEMENT OF THE SECTION 1108 EVIDENCE VIOLATED DUE PROCESS 45

A. Clearly Established Law 45

B. The Misstatement 46

C. The State Court's Alternative Merits Ruling Was Unreasonable 47

D. Forfeiture 48

V. GROUND THREE: THE ADMISSION OF THE SECTION 1108 PROPENSITY EVIDENCE, AS APPLIED, RENDERED THE TRIAL FUNDAMENTALLY UNFAIR 49

VI. THE ERRORS WERE PREJUDICIAL UNDER BRECHT 51

VII. CONCLUSION 54

# TABLE OF AUTHORITIES

**Cases**


*Alberni v. McDaniel*, 458 F.3d 860 (9th Cir. 2006) 49

*Amaya v. Frauenheim*, 823 F. App'x 503 (9th Cir. 2020) 41

*Andrew v. White*, 604 U.S. 86 (2025) passim

*Atkins v. Bean*, 122 F.4th 760 (9th Cir. 2024) 7

*Andrew v. Tinsley*, 164 F.4th 789 (10th Cir. 2026) 42

*Berger v. United States*, 295 U.S. 78 (1935) 45

*Bowen v. Roe*, 188 F.3d 1157 (9th Cir. 1999) 5

*Boyde v. California*, 494 U.S. 370 (1990) 38

*Bradford v. Paramo*, 100 F.4th 1088 (9th Cir. 2024) 33

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) 33, 51

*Bredemeier v. Phillips*, 786 F. Supp. 3d 1300 (C.D. Cal. 2025) 41

*Brodit v. Cambra*, 350 F.3d 985 (9th Cir. 2003) 40, 41

*Brown v. Davenport*, 596 U.S. 118 (2022) 33

*Buck v. Davis*, 580 U.S. 100 (2017) 38

*Cool v. United States*, 409 U.S. 100 (1972) 39

*Cullen v. Pinholster*, 563 U.S. 170 (2011) 42

*Darden v. Wainwright*, 477 U.S. 168 (1986) 40, 45, 47

*Deck v. Jenkins*, 814 F.3d 954 (9th Cir. 2016) 48

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974) 45

*Dowling v. United States*, 493 U.S. 342 (1990) 36, 45

*Estelle v. McGuire*, 502 U.S. 62 (1991) 34, 36, 38, 49

*Francis v. Franklin*, 471 U.S. 307 (1985) 39

*Gimenez v. Ochoa*, 821 F.3d 1136 (9th Cir. 2016) 36, 45

*Hall v. Florida*, 572 U.S. 701 (2014) 42

*Harrington v. Richter*, 562 U.S. 86 (2011) 32

*Harris v. Reed*, 489 U.S. 255 (1989) 48

*Holley v. Yarborough*, 568 F.3d 1091 (9th Cir. 2009) 34, 41

*Huffman v. Ricketts*, 750 F.2d 798 (9th Cir. 1984) 25

*In re Winship*, 397 U.S. 358 (1970) 40

*Jammal v. Van de Kamp*, 926 F.2d 918 (9th Cir. 1991) 36, 37, 45

*Johnson v. Williams*, 568 U.S. 289 (2013) 32, 35

*Kipp v. Davis*, 971 F.3d 939 (9th Cir. 2020) 35, 47

*Kotteakos v. United States*, 328 U.S. 750 (1946) 33

*Kyles v. Whitley*, 514 U.S. 419 (1995) 53

*Marks v. Davis*, 106 F.4th 941 (9th Cir. 2024) 33, 36, 47

*Martinez v. Quick*, 134 F.4th 1046 (10th Cir. 2025) 42

*Mayle v. Felix*, 545 U.S. 644 (2005) 6

*Michelson v. United States*, 335 U.S. 469 (1948) 49

*Middleton v. McNeil*, 541 U.S. 433 (2004) 38

*Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) (en banc) 34

*O'Neal v. McAninch*, 513 U.S. 432 (1995) 33, 51

*Panetti v. Quarterman*, 551 U.S. 930 (2007) 33

*Parker v. Matthews*, 567 U.S. 37 (2012) 46

*Parle v. Runnels*, 505 F.3d 922 (9th Cir. 2007) 33

*Payne v. Tennessee*, 501 U.S. 808 (1991) passim

*People v. Bowker*, 203 Cal. App. 3d 385 (1988) 37

*People v. Earle*, 172 Cal. App. 4th 372 (2009) 46

*People v. Falsetta*, 21 Cal. 4th 903 (1999) 27, 49, 50

*People v. Gonzales*, 16 Cal. App. 5th 494 (2017) 3, 34, 35, 39

*People v. Housley*, 6 Cal. App. 4th 947 (1992) 40

*People v. Julian*, 34 Cal. App. 5th 878 (2019) 38

*People v. Kelly*, 17 Cal. 3d 24 (1976) 34, 35

*People v. Lapenias*, 67 Cal. App. 5th 162 (2021) 38

*People v. Martin*, No. B325048, 2024 WL 3022464 (Cal. Ct. App. June 17, 2024) passim

*People v. McAlpin*, 53 Cal. 3d 1289 (1991) 36

*People v. Munch*, 52 Cal. App. 5th 464 (2020) 3, 34, 37, 44

*People v. Page*, 114 Cal. App. 5th 1022 (2025) 39

*People v. Saldana*, 19 Cal. App. 5th 432 (2018) 53

*People v. Wilson*, 33 Cal. App. 5th 559 (2019) 38

*People v. Zaheer*, 54 Cal. App. 5th 326 (2020) 52

*Perry v. New Hampshire*, 565 U.S. 228 (2012) 41

*Picard v. Connor*, 404 U.S. 270 (1971) 7

*Ramirez v. County of San Bernardino*, 806 F.3d 1002 (9th Cir. 2015) 6

*Ross v. Williams*, 950 F.3d 1160 (9th Cir. 2020) (en banc) 6

*Spencer v. Texas*, 385 U.S. 554 (1967) 49

*State v. G.E.P.*, 243 N.J. 362 (2020) 43

*State v. J.L.G.*, 190 A.3d 442 (N.J. 2018) 43

*Sullivan v. Louisiana*, 508 U.S. 275 (1993) 40

*United States v. Varoudakis*, 233 F.3d 113 (1st Cir. 2000) 52

*United States v. Velarde-Gomez*, 269 F.3d 1023 (9th Cir. 2001) (en banc) 52

*United States v. Weatherspoon*, 410 F.3d 1142 (9th Cir. 2005) 48

*Vasquez v. Hillery*, 474 U.S. 254 (1986) 7

*Williams v. Taylor*, 529 U.S. 362 (2000) 32

*Wilson v. Sellers*, 584 U.S. 122 (2018) 32

**Constitutional Provisions and Statutes**

U.S. Const. amend. VI 24, 27

U.S. Const. amend. XIV passim

28 U.S.C. § 2241 1

28 U.S.C. § 2242 6, 30

28 U.S.C. § 2244 5

28 U.S.C. § 2254 passim

Cal. Evid. Code § 352 3, 27, 49

Cal. Evid. Code § 1108 passim

Cal. Penal Code § 288 1, 2, 15

Cal. Penal Code §§ 311.4, 311.11 1, 2, 15

Cal. Penal Code §§ 667, 667.61, 1170.12, 1203.066 2, 3

**Rules**

Fed. R. Civ. P. 10(c) 6

Fed. R. Civ. P. 15(a) 6

Rules Governing Section 2254 Cases, Rule 8 28

Rules Governing Section 2254 Cases, Rule 12 6

U.S. Sup. Ct. R. 13.1 5

C.D. Cal. L.R. 11-6.1 55

**Jury Instructions**

CALCRIM No. 222 19, 47, 48

CALCRIM No. 1193 passim

**Other Authorities**

Bruck & Ceci, *The Suggestibility of Children's Memory*, 50 Ann. Rev. Psychol. 419 (1999) 44

Denne et al., *Characteristics of Exonerated Cases of Child Sexual Abuse*, 17 Frontiers Psychol. 1794898 (2026) 44

Denne et al., *The Effects of Evidence-Based Expert Testimony on Perceptions of Child Sexual Abuse Involving Recantation*, 16 PLoS ONE e0254961 (2021) 44

Goodman-Delahunty et al., *Greater Knowledge Enhances Complainant Credibility and Increases Jury Convictions for Child Sexual Assault*, 12 Frontiers Psychol. 624331 (2021) 44

Judicial Council of Cal., Advisory Com. on Criminal Jury Instructions, Rep. (Sept. 20, 2022) 39

London et al., *Disclosure of Child Sexual Abuse: What Does the Research Tell Us About the Ways That Children Tell?*, 11 Psychol. Pub. Pol'y & L. 194 (2005) 43

O'Donohue & Benuto, *Problems with Child Sexual Abuse Accommodation Syndrome*, 9 Sci. Rev. Mental Health Prac. 20 (2012) 43

O'Donohue et al., *The Frequency of False Allegations of Child Sexual Abuse: A Critical Review*, 27 J. Child Sexual Abuse 459 (2018) 43

Poole & Lindsay, *Children's Eyewitness Reports After Exposure to Misinformation From Parents*, 7 J. Experimental Psychol.: Applied 27 (2001) 44

Summit, *The Child Sexual Abuse Accommodation Syndrome*, 7 Child Abuse & Neglect 177 (1983) 42

Summit, *Abuse of the Child Sexual Abuse Accommodation Syndrome*, 1 J. Child Sexual Abuse 153 (1992) 43

Weiss & Alexander, *Sex, Lies, and Statistics: Inferences From the Child Sexual Abuse Accommodation Syndrome*, 41 J. Am. Acad. Psychiatry & L. 412 (2013) 43

# FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Travis Edward Martin, by and through counsel, respectfully petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 and by this verified First Amended Petition alleges the following facts and grounds for issuance of the writ:

## I. JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 2241 and 2254. Petitioner is in custody under the judgment of a California court and contends that his custody violates the Constitution of the United States.

## II. CUSTODY, VENUE, AND THE JUDGMENT UNDER ATTACK

### A. Custody and Venue

Petitioner is detained at the Richard J. Donovan Correctional Facility, 480 Alta Road, San Diego, California 92179, in the custody of respondent Raphael Acevedo, Warden. Petitioner's California Department of Corrections and Rehabilitation number is BU6031. Petitioner was convicted and sentenced in the Superior Court of Ventura County, which lies within this district, so venue is proper here. 28 U.S.C. § 2241(d). The original petition was filed in the Southern District of California, the district of

confinement, on November 19, 2025, and was transferred to this Court on November 21, 2025.

**B. The Judgment**

By amended information filed September 22, 2022, in Ventura County Superior Court case no. 2021029627, petitioner was charged with seven counts of committing a lewd act upon a child, Cal. Penal Code § 288(a) (counts 1 through 7), one count of posing or modeling a minor for sexual purposes, § 311.4(c) (count 8), and one count of possession or control of child pornography, § 311.11(a) (count 9). (2CT 465-79.) The information alleged two prior convictions under § 288(a) as strikes and as serious felony priors, §§ 667(a), (c)(2), (e)(2), 1170.12, and, as to counts 1 through 7, two prior convictions within the meaning of § 667.61(a) and (d) and substantial sexual conduct within the meaning of § 1203.066(a)(8). (2CT 469-78.)

On September 29, 2022, petitioner admitted the prior conviction allegations. (13RT 1814-20.) On October 3, 2022, the jury found petitioner guilty on all nine counts and found the § 1203.066(a)(8) allegations true as to counts 1 through 7. (3CT 605-13, 628; 14RT 1854-57.) On November 8, 2022, the court sentenced petitioner to an aggregate indeterminate term of 610 years to life: on each of counts 1 through 7, twenty-five years to life

tripled under the Three Strikes law, plus five years under § 667(a), and on each of counts 8 and 9, twenty-five years to life, all terms consecutive. (3CT 635-36; 15RT 1913-15.)

## III. DIRECT APPEAL AND EXHAUSTION OF STATE REMEDIES

Petitioner filed a timely notice of appeal on December 31, 2022. (3CT 658.) In the California Court of Appeal, Second Appellate District, Division Six, petitioner raised six claims. He argued that the admission of propensity evidence under California Evidence Code § 1108 violated his Sixth and Fourteenth Amendment rights to due process and a fair trial. (AOB 19-36.) He argued that the prosecutor committed misconduct, in violation of the Fourteenth Amendment, when he told the jury that all of the § 1108 evidence involved oral copulation and photography. (AOB 36-41.) He argued that the admission of expert testimony on Child Sexual Abuse Accommodation Syndrome ("CSAAS") violated his Sixth and Fourteenth Amendment rights because the testimony is unreliable "scientific" evidence that is not generally accepted (AOB 42-50), and that CALCRIM No. 1193 violated the Sixth and Fourteenth Amendments because it permitted the jury to use CSAAS to determine guilt (AOB 50-53).

Additionally, he argued cumulative error. (AOB 53-55.) And he raised two sentencing claims: that the trial court abused its discretion in

refusing to strike the § 667(a) enhancements (AOB 55-56), and that the sentence was cruel and unusual (AOB 57-59).[1]

The Court of Appeal affirmed in an unpublished opinion filed June 17, 2024. *People v. Martin*, No. B325048, 2024 WL 3022464 (Cal. Ct. App. June 17, 2024). The slip opinion, which was appended to the petition for review filed with the original petition, is cited herein by page as "Opn." The court held that the § 1108 evidence was properly admitted under Evidence Code § 352. (Opn. 7-9.)

It found that "[t]he prosecutor misstated the evidence in closing argument when he indicated that all the prior offenses involved oral copulation and photography," held the claim forfeited for lack of objection, and held in the alternative that the misstatement was harmless "under both federal and state constitutional standards" because it was "circumscribed," the jury was instructed that argument is not evidence, and the prior and charged offenses "shared many similarities." (Opn. 9-10.) It rejected the CSAAS claim on the authority of *People v. Munch*, 52 Cal. App. 5th 464

---

[1] Although the Court of Appeal characterized petitioner's CSAAS arguments as contending that the trial court "improperly admitted expert evidence" (Opn. 2), and did not address the federal claims (Opn. 11-13), the opening brief set out the constitutional grounds in both the headings and the body of the argument. (AOB 2-3, 19, 36, 42, 50-53.)

(2020), and the CALCRIM No. 1193 claim on the authority of *People v. Gonzales*, 16 Cal. App. 5th 494 (2017), reasoning that the instruction leaves "the parties free to argue and the jury to determine what the conduct may mean, including that the behavior, such as delay in reporting, could be indicative of falsehood." (Opn. 11-13.) The court cited no federal authority in its discussion of the CSAAS evidence or the instruction.

Petitioner filed a timely petition for review in the California Supreme Court on July 19, 2024, presenting the following issues:

> 1) Whether the trial court committed prejudicial error and violated appellant's Sixth and Fourteenth Amendment right to due process and a fair trial when it admitted the section 1108 testimony.
>
> 2) Whether the prosecutor committed misconduct when he misled the jurors by telling them all of the section 1108 evidence involved oral copulation and photography and whether this misconduct violated appellant's Fourteenth Amendment due process right to a fair trial.
>
> 3) Whether the trial court violated appellant's Sixth and Fourteenth Amendment rights by admitting unreliable

"scientific" evidence that is not generally accepted by the scientific community.

4) Whether CALCRIM No. 1193 violates a defendant's Sixth and Fourteenth Amendment rights to due process because it misstates the law and permits the jury to use CSAAS to determine whether petitioner was guilty.

(PFR 9; *see also* PFR 10-32.) The California Supreme Court denied review on August 21, 2024, without comment. (No. S286029.)

Each ground pled in this First Amended Petition was fairly presented to the California Supreme Court. Ground One corresponds to issues 3 and 4 (PFR 20-32), Ground Two to issue 2 (PFR 17-20), and Ground Three to issue 1 (PFR 10-17). The cumulative error and Eighth Amendment claims presented to the Court of Appeal were not included in the petition for review. They are not pled here.

## IV. TIMELINESS

Under 28 U.S.C. § 2244(d)(1)(A), the one-year limitation period runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." Petitioner did not seek certiorari. His judgment therefore became final on November 19, 2024, ninety days after the denial of review. *Bowen v. Roe*,

188 F.3d 1157, 1158-59 (9th Cir. 1999); U.S. Sup. Ct. R. 13.1. The original petition, filed November 19, 2025, was timely. As set forth in Section VI, this First Amended Petition relates back to that filing.

## V. FEDERAL PROCEDURAL HISTORY

The original petition, filed by counsel on November 19, 2025, pled a single ground with two parts: that the admission of the CSAAS evidence and the CALCRIM No. 1193 instruction, separately and cumulatively, violated petitioner's rights to due process and a fair trial. (Dkt. 1.) Filed with it were the opening brief and the petition for review from the direct appeal, and a document entitled "Supplemental Petition for Writ of Habeas Corpus by a Person in State Custody," prepared and verified by petitioner, which pled six claims, including the three pled here as well as cumulative error and Eighth Amendment claims. (Dkt. 1.)

On June 9, 2026, the Court ordered respondent to respond. (Dkt. 7.) On July 1, 2026, respondent moved to dismiss. (Dkt. 9.) Respondent did not contest the exhaustion of the CSAAS and instruction claim, the § 1108 claim, or the prosecutorial misconduct claim. Respondent argued that, if the supplemental petition is deemed part of the counseled petition, the cumulative error and Eighth Amendment claims are unexhausted because they were not presented to the California Supreme Court, and asked that the

petition be dismissed unless those two claims are deleted. (Dkt. 9 at 8-10.) On July 9, 2026, the Court granted petitioner's application and extended to August 31, 2026, both the time to oppose the motion and the period within which petitioner may file an amended petition as a matter of course under Federal Rule of Civil Procedure 15(a)(1)(B). (Dkt. 12.)

## VI. AMENDMENT AS OF COURSE, SUPERSESSION, AND RELATION BACK

This First Amended Petition is filed as a matter of course under Federal Rule of Civil Procedure 15(a)(1)(B), made applicable by 28 U.S.C. § 2242 and Rule 12 of the Rules Governing Section 2254 Cases, within the period the Court extended by its order of July 9, 2026. (Dkt. 12.) No leave of court is required. Should the Court conclude otherwise, petitioner requests leave under Rule 15(a)(2), which is to be "freely give[n]" where, as here, the amendment narrows the case, cures the only objection respondent has raised, and prejudices no one.

This First Amended Petition supersedes the original petition and every document filed with it, including the supplemental petition, and is the sole operative pleading. *Ramirez v. County of San Bernardino*, 806 F.3d 1002, 1008 (9th Cir. 2015). Petitioner elects not to pursue the cumulative error

and Eighth Amendment claims that were pled in the supplemental petition. No claim for ineffective assistance of counsel is pled.

Each of the three grounds pled here relates back to November 19, 2025. An amended habeas petition relates back when the new pleading and the original arise from a common "core of operative facts." *Mayle v. Felix*, 545 U.S. 644, 664 (2005). The original petition includes the written instruments filed as exhibits to it. Fed. R. Civ. P. 10(c); *Ross v. Williams*, 950 F.3d 1160, 1167 (9th Cir. 2020) (en banc). Ground One was pled in the counseled petition itself. Grounds Two and Three were pled, on the same operative facts alleged here, in the supplemental petition filed with and as part of the original petition. Respondent's motion proceeded on the premise that the supplemental petition is part of the counseled petition. (Dkt. 9 at 5-6.) Every claim therefore relates back.

The additional record citations in this petition supplement and corroborate the factual basis of the exhausted claims. They do not fundamentally alter those claims or place them in a significantly different evidentiary posture, and every citation is to the record that was before the state courts. *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986); *Atkins v. Bean*, 122 F.4th 760, 771-73, 784 (9th Cir. 2024). Exhaustion turns on what was presented to the state courts, not on the authorities cited in this Court, and

the ultimate question for disposition may remain the same "despite variations in the legal theory or factual allegations urged in its support." *Picard v. Connor*, 404 U.S. 270, 277 (1971); *Atkins*, 122 F.4th at 772-73.

## VII. EFFECT ON THE PENDING MOTION TO DISMISS

Because this First Amended Petition omits the two claims respondent identified as unexhausted and supersedes the pleading to which the motion was directed, respondent's motion to dismiss (Dkt. 9) is moot. Petitioner is filing a short response to the motion concurrently.

## VIII. STATEMENT OF FACTS

The Statement of Facts rests on the certified Reporter's Transcript and Clerk's Transcript of the state court proceedings, as cited in petitioner's opening brief on appeal, and on the Court of Appeal's opinion. Petitioner disputes the allegations against him and the testimony elicited against him at trial.[2]

### A. Background

Natalie Wald met petitioner in 2008 through his parents, whom she and her husband, James Wald, knew from church. (8RT 783-84; 9RT 945;

---

[2] The complaining witness is referred to as "Jane Doe" or "Doe." Bracketed substitutions of "[Jane Doe]" in quotations from the record replace the name used in the transcripts. No other alteration has been made to quoted material.

12RT 1616.) Petitioner's mother had told Natalie that petitioner had been incarcerated in a child sexual abuse case. (9RT 944; 12RT 1616-17.) The case had been in the newspapers, and people knew what had happened. (12RT 1617.) Natalie knew petitioner was a registered sex offender and had looked him up online. (8RT 792.) Petitioner told her his prior case involved sexual conduct with a girl under thirteen. (8RT 791; 9RT 945.)

The Walds have a son, born in October 2010, and a daughter, Jane Doe, born in February 2015. (7RT 523; 8RT 749.) In 2016, James and petitioner became business partners in a sound company, Entertainment Technology. (8RT 785, 788.) James contributed no money to the purchase and received a ten percent share. (9RT 1083-84.) He was paid $500 per show. (9RT 1085.) Natalie did the accounting for the company (8RT 797-98; 9RT 980), and in 2017 worked forty hours a week for petitioner's other company, Airlink Internet, at $20 an hour (8RT 789, 797; 9RT 985, 1013-1014). Natalie worked at a school and had been a mandated reporter since 2008. (8RT 786-787; 9RT 962-963.)

Petitioner paid for family trips with the Walds to Disneyland, Great Wolf Lodge, and June Lake (8RT 798-99; 9RT 1089, 1178; 12RT 1630), paid the Wald children's private school tuition (8RT 795-796; 9RT 974-76, 1011, 1013), and loaned the family money when they were short on rent

(8RT 797; 9RT 975). After petitioner's 2017 divorce, the family spent more time with him. (8RT 790.) He took the children to his home in Oxnard, where he lived with his mother, once or twice a week. (8RT 794; 9RT 987.) The children thought of him as a fun uncle and of his mother as a grandmother. (8RT 804.)

**B. The 2019 Statement and Two Years of Questioning**

Natalie testified that sometime before September 28, 2019, when Doe was four, Doe said petitioner had licked her "hoo-hoo," the family's word for vagina. (8RT 800-01, 808; 9RT 971-72, 1007.) The statement came while the family was watching television. Doe, then four and "still at preschool," said it as "just a statement": "Bubba licked me." (8RT 800-801.) Natalie assumed Doe meant her face, because petitioner and the children "would cough in each other's face to be funny, flatulate on each other, just goof around." (8RT 801.)

Only after Natalie questioned Doe did she say he had licked her "hoo-hoo." (8RT 801.) Natalie called petitioner and yelled at him. (8RT 802.) Petitioner adamantly denied it, said an allegation like that could ruin him, and said he could not spend time with Doe. (8RT 802, 805.) Doe cried and said she did not know why she had said it. (8RT 806.) Natalie, a mandated reporter, did not report the statement to the police or Child Protective

Services and did not tell petitioner's mother. (8RT 804, 806.) Within a few months, petitioner was seeing the children again and things returned to the way they had been. (8RT 808.)

From that time until November 2021, a period of at least twenty one months, Natalie asked Doe every few weeks whether there had been "any licking going on." Doe said no every time. (8RT 810; 9RT 965.) Natalie agreed on cross examination that she asked about twice a month, at least forty-one times. (9RT 965-67.) She also asked Doe about the 2019 statement, "Was that a truth or a lie?", as part of recurring "truths and lies" talks. (8RT 810-11.) And she used a second script, "sometimes" in petitioner's presence: "Nobody touches you, right?" "Nobody touches you? Nobody licks you? The only person that sees you down there is a doctor." (8RT 826.)

What questioning preceded the 2019 statement is not in the record. The prosecutor's only temporal question was bounded, "Between that first time and November of 2021, did you ever ask her about it?", and no witness was asked what came before. (8RT 810.) The People's own expert testified that preschool aged children "have the potential to be suggestible when asked inappropriate questions," and that a substantial minority of children

asked improper questions "may respond to them, respond to the way the question is presented to them." (8RT 735, 737.)

**C. The Financial Relationship Ends and Natalie Threatens Petitioner**

On October 27, 2021, petitioner told Natalie and James that Natalie would no longer do the accounting for Entertainment Technology. (8RT 814.) On October 31, 2021, Natalie and petitioner argued about whether he could lift Doe and whether Doe should sleep in Natalie's bed. (8RT 818-19.) The argument escalated and Natalie threatened to call the police. (8RT 825.) She told petitioner: "I'll get you, Sucker. One phone call is all it will take. My pride is bigger than yours. Who do you think they'll believe." (9RT 1028.) She also said, "Nobody's going to make a canoe out of me," meaning no one was going to take her down without going down too. (9RT 1028-29.) Natalie knew such a threat would concern petitioner given his prior convictions, and knew the police were more likely to believe an accusation against him because of his history. (9RT 1026-27.)

On November 3, 2021, petitioner told Natalie that his mother would take over the accounting. (9RT 1031.) The accounting role had brought Natalie a Christmas bonus and payment of the family's cell phone bills, about $400 a month, and car insurance. (8RT 797-98; 9RT 979.) That same day James discussed with Natalie the changes petitioner was trying to make

to the company's corporate documents after the October 31 confrontation. (9RT 1029.)

**D. The November 2021 Disclosure and the Forensic Interview**

On Thursday, November 4, 2021, Doe reported that a girl had looked under a bathroom stall at her at school. Natalie then asked her, "Well, has anybody else ever looked at you?" and "Has anybody else ever touched you?" Doe answered "No" to both. (8RT 811.) Natalie testified that "when she said no the second time, it didn't sit well," that she "didn't want to push it," and that the next day, after "really bad sleep," she "just had a feeling that she was lying to me when she said no." (8RT 811-12.) Asked why she suspected that Doe was being molested, she answered: "Because I didn't like the way she said 'no' to me when I asked her." (8RT 812.)

On November 5, Natalie told a co-worker that she thought Doe "might be being molested," and the two went to the school's dean, who wrote out questions for Natalie to put to the child away from school. (8RT 812-13.) Natalie followed the script that afternoon, at a Starbucks and then at Camino Real Park: God "sees everything, even if we think we are being secretive about it," did Doe have secrets with anybody at school, a secret Natalie then shared about herself, and did Doe have secrets with anybody else. When Doe nodded, Natalie supplied the candidates: "Well, who do you have

secrets with? Mommy? Daddy? [her brother]? Bubba?" Doe answered, "Bubba." (8RT 812-13, 829-30.) According to Natalie, Doe then said petitioner licked her "hoo-hoo" but called it cleaning, touched her "hoo-hoo," and had Doe touch and put her mouth on his private part, at Disneyland and June Lake. (8RT 830-832.) Natalie called the police that day. (8RT 834; 9RT 915.)

An officer met Natalie at the school that afternoon and told her to "play business as usual" and to make up something to keep petitioner away from Doe. (8RT 835.) Natalie told petitioner and James that Doe had tested positive for COVID and that the family had to quarantine, so he could not see her. (8RT 836.) There was no quarantine. (8RT 835-37.) The story cancelled a sleepover with petitioner's mother set for that same day and kept Doe at home in Natalie's company until the forensic interview. (8RT 836-39.) On November 5 Natalie and petitioner spoke by phone for eighty-two minutes, and on November 6, against the officer's instruction, she told him about the allegations. (8RT 837, 839; 9RT 1043.)

At petitioner's request she then staged an exchange with Doe: petitioner listened on speaker and texted Natalie the questions, Natalie put them to the child, "and then I told her to say no. I was shaking my head at her, saying, 'You do not want to see him. You do not want to see him.'"

(8RT 840-841.) The prosecutor asked, "Did [Jane Doe] follow your instructions and give the responses you were telling her to give?" Natalie answered, "Yes." (8RT 841.) The exchange ended with Doe "crying and saying that she didn't know what to say because I'm sure she wanted to see him." (8RT 841.) Doe remained with Natalie until her forensic interview four days later, and no interview protocol governed what happened in between. (8RT 839; 2CT 398-430.)

Detective Meagan Yates interviewed Doe on November 9, 2021, when Doe was six and a half. (2CT 398-430.) Asked why she was there, Doe said, "I don't know," and then, "I--my mommy told me but I forgot." (2CT 404.) Asked what happened in the bedroom with petitioner, she said, "I don't remember," and, when pressed, "I wanna tell you it but I can't remember." (2CT 413.) She "seriously can't remember" anything uncomfortable happening at petitioner's mother's house. (2CT 424.) She was "nervous to tell you" and feared the detective would get mad at her (2CT 407), and, asked where petitioner touched her, said, "I think you'll be mad at me" (2CT 416). Doe later testified that the only thing she was spanked for was telling a lie. (7RT 557.)

Doe also said petitioner had touched her vagina with his tongue since she was one year old (2CT 426), although she could not remember her first,

second, or third birthdays (7RT 561), and said, "I feel like he's making me feel like he loves me but he's just making me do like the stuff that I told you. . . . He just trying to control me." (2CT 428.) Doe told the detective petitioner never took pictures of her. (2CT 426-27.) The only person Doe told before the police was Natalie. (2CT 429.)

At trial in September 2022, Doe, then seven, testified that petitioner licked and touched her vagina at Great Wolf Lodge, that he did so at his house, and that he orally copulated her at his home and at Disneyland. (Opn. 3.)

**E. The Photographs**

Thirteen photographs recovered from an iPad owned by petitioner underlie counts 8 and 9. (11RT 1373.) One shows an adult hand spreading the labia. (11RT 1384.) What the images depict was established by the People's own examiner. Randy Mitchell, the computer forensic examiner for the high technology task force staffed jointly by the District Attorney's office and the Sheriff's office (11RT 1360), went through the photographs one by one on cross examination and described what each shows: two or three small pieces of fecal matter (11RT 1403), a brownish black discoloration around the anus and vagina with apparent reddening at the anus (11RT 1408), and visible redness around the vaginal area (11RT 1417-

18) and across the buttocks (11RT 1424). He agreed that a parent or caretaker may have to remove fecal material from precisely those areas of a young girl. (11RT 1408-09.)

The family testimony matched the images. Doe suffered rashes fairly often in preschool and kindergarten because she did not wipe properly. (9RT 940, 1001-02.) Petitioner had been upset with Natalie for not taking care of Doe's rash, and Natalie confirmed that petitioner sometimes raised the rashes with her and on about two occasions offered or said he was going to send her pictures documenting one. (9RT 1053-54; 12RT 1626.) In closing, the prosecutor acknowledged that the images contain "a rash" and "a small piece of poop," disputing only whether those were "the focus of those shots." (13RT 1736.)

Mitchell examined twenty-three of petitioner's devices, including the iPad and a Pixel phone, and found no other relevant photographs and no videos. (11RT 1360, 1366, 1429, 1437.) He found none of the file sharing applications normally associated with child pornography on any of the devices. (11RT 1435-36.)

**F. The Evidence Code Section 1108 Evidence**

Over written and oral objection that the evidence was remote, cumulative, unduly prejudicial, and would require mini-trials (1CT 271-74;

2RT 104-05, 108), the trial court admitted the testimony of three women under Evidence Code § 1108, finding that the probative value outweighed the prejudice and the consumption of time (2RT 108-09).

Autumn F., twenty-seven at trial, testified that in 2005 and 2006, when she was about ten, petitioner had her undress at his shop, photographed her, inserted his finger in her vagina, and licked her vagina, and that he later touched her vagina with his tongue over her underwear. (6RT 377, 380-86.) She testified that it was physically painful, that petitioner "betrayed" her "in such a cruel manner," that it was "sickening," and that it "twisted [her] mind." (6RT 381, 383.) Petitioner had confessed to the conduct involving Autumn in June 2006 (2CT 322-82), the recorded confessions were played for the jury (6RT 451), and in October 2006 he pled guilty to two counts under § 288(a) and one count under § 311.4(c) (1CT 265, 469). The prosecutor told the jury of the convictions in opening statement (6RT 363), and the parties stipulated to them (4CT 891; 10RT 1306).

Hailee G., twenty six at trial, testified that in 2006, when she was about ten and her family lived with petitioner for about a year, petitioner touched her vagina and inserted a finger. (6RT 395-99.) Her sister Kasey N., twenty-two at trial, testified that in 2006, when she was six, petitioner

put his hand down her pants and rubbed her vagina more than three times, usually at night. (6RT 433-37.) Petitioner denied those allegations, no charges were ever filed, and there was no corroborating evidence. (2RT 104; 7RT 518.) Neither Hailee nor Kasey described oral copulation or photography. (6RT 395-431, 433-48.) Hailee recalled her mother and stepmother asking whether anything had happened with petitioner around the time of the news about Autumn's allegations. (6RT 403.) Kasey testified that she and her siblings talked with each other about petitioner wanting them to sit on his lap. (6RT 445.)

### G. The CSAAS Testimony

The People sought admission of the CSAAS testimony by a written motion in limine under the heading "The People Intend to Use a CSAAS Expert to Dispel Myths and Misconceptions About How a Child Reacts to Abuse, Not to Demonstrate Abuse Actually Occurred." The motion acknowledged that jurors must be "admonished that the testimony does not demonstrate that the abuse occurred," and may use it only as "showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (1CT 239-40.)

Dr. Anthony Urquiza testified for the prosecution about CSAAS. (8RT 707-47.) He explained that the concept originated in a 1983 article by

Dr. Roland Summit written to help therapists treating children who had been sexually abused, by educating them about common characteristics of such children and dispelling myths about them. (8RT 713.) He described five components: secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and retraction or recantation. (8RT 716-29.)

Dr. Urquiza testified that CSAAS is not a diagnosis and is not a tool to identify who has been molested. (8RT 715-16, 730.) Dr. Summit's concept did "exactly the opposite": "he was describing kids who had been abused." (8RT 715.) Dr. Urquiza acknowledged that children do make false allegations of sexual abuse. (8RT 733, 737-38.) He knew nothing about this case. He had not reviewed the police reports, had not interviewed any witness, and did not know the complaining witness's sex or age: "Other than the name of the defendant, I know absolutely nothing about this case." (8RT 730.) He testified that "certain aged kids, usually preschool-aged kids, have the potential to be suggestible when asked inappropriate questions" (8RT 735), and that such a child may "answer the question in a way that may not be an accurate representation of what's in their head, but more suggestible what they think to be the response of sort of the interviewer" (8RT 736). Asked whether children become less suggestible as they age, he answered that "there is a concern with a substantial minority of kids, when they're

asked improper questions, that they may respond to them, respond to the way the question is presented to them," but that "once you get into about 5 or 6 and older, that is not something that usually happens." (8RT 737.) He did not testify that the risk disappears at any age.

Dr. Urquiza testified that it is not the responsibility of an expert witness, "particularly me, who doesn't know anything about the facts of the case[,] to provide an opinion about whether somebody is abused or not." (8RT 739-40.) He acknowledged that he has done no research of his own on false allegations and that the body of research is "not very large." (8RT 740.) Asked whether his review of that research showed reasons that children falsely report sexual abuse, he began, "I have to be a little bit careful here because what I don't want to do is to provide any percentages of how often kids do or don't make it," and then told the jury: "The number of children who have made false allegations of sexual abuse is fairly low. So our ability to examine what are the reasons for those false allegations is really diminished because there's just not enough numbers for us to be able to do that type of analysis with any validity." (8RT 741.)

Dr. Urquiza's testimony about suggestibility was confined to the forensic interview. He testified that "in the context of forensic interviewing, we know that, although still a minority, some number of kids are responsive

to improper questions by a forensic interviewer." (8RT 741.) Asked about research on the effect of parental input on how children report alleged abuse, he answered: "We have very little research about what happens prior to a forensic interview," and, again, "we have very little research about what goes on prior to that forensic interview." (8RT 742.) On recross he explained that most California counties use a ten step interview protocol and that "if you adhere to those ten steps, then you really minimize the likelihood of any leading or suggestive questions," adding that if an interviewer veered from the protocol he "would have a concern if the child was in that more vulnerable preschool age group." (8RT 745-46.) Asked what follows if the improper questioning came before the forensic interview, "such as a parental influence that repeatedly asked a child a question over and over and over again that was leading and suggestive," he answered that "we have very little information about what happens prior to that initial forensic interview," and that he could not "definitively tell you what happens before that time." (8RT 746.) No limiting instruction accompanied Dr. Urquiza's testimony when it was given. (8RT 707-47.) The only limitation the jury received came in the final charge. (13RT 1718-19.)

**H. The Instruction and the Closing Arguments**

The court instructed the jury with CALCRIM No. 1193 as follows:

> You've heard testimony from Dr. Anthony Urquiza regarding Child Sexual Abuse Accommodation Syndrome. Dr. Urquiza's testimony about Child Sexual Abuse Accommodation Syndrome is not evidence that the defendant committed any other crimes charged against him or any conduct or crimes with which he was not charged. You may consider this evidence only in deciding whether or not [Jane Doe]'s conduct was not inconsistent with the conduct of someone who was molested and in evaluating the believability of her testimony.

(13RT 1718-19.) The written instruction stated that the testimony "is not evidence that the defendant committed any of the crimes charged against him" and referred to "someone who has been molested." (3CT 585; Opn. 11 n.5.) As orally delivered, the only exclusion the jury heard was of "any other crimes charged against him" and uncharged conduct. (13RT 1719.) The jury was also instructed that if it decided petitioner committed the uncharged offenses, it could "conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses" and could "also conclude that the defendant was likely to commit and did commit" the

charged offenses. (13RT 1717.) And it was instructed that the attorneys' arguments are not evidence. (CALCRIM No. 222; Opn. 10.)

Doe's testimony was the prosecution's entire case. (13RT 1799.) The prosecutor told the jury that "her testimony all by itself is sufficient to prove this case beyond a reasonable doubt if you believe her." (13RT 1740.) In rebuttal he put it plainly: "Ultimately, you have to resolve one issue: Did he actually sexually abuse her? And that comes down to the issue of whether she is telling the truth or whether she isn't." (13RT 1799.) And he told the jury how to decide whether to believe her: "You can also consider Dr. Urquiza's testimony for the limited purpose of evaluating her credibility. He talked to you about how child sexual abuse victims act and how they behave. You can use that in evaluating her credibility." (13RT 1738.)

The prosecutor then applied the syndrome to Doe, component by component. He recited the framework: "He talked about those five aspects of that framework: the secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and retraction." (13RT 1738.) He explained the mechanism: the reaction of the caregivers "is so critical," and without "supportive caregivers who listen, who protect the child," "the disclosures will stop. They may be retracted." (*Id.*) And he applied it: "Well, what happened to [Jane Doe]? She didn't get supported by

her caregivers. Her mom didn't support her. She called and had an angry fight with the defendant, who [Jane Doe] did love, in front of [Jane Doe]." (13RT 1738.) "Her dad didn't try to protect her. He left the room." (13RT 1739.) "She told you, 'My mom didn't believe me the first time I told her.' So what's [Jane Doe] supposed to do? Why tell again? Why tell these things that are so hard to talk about? There is no point. She has to just suffer through it." (*Id.*) He assured the jury that "[t]here is no evidence that her first disclosure was suggested. By all the testimony, it was a lightning bolt out of the clear blue sky," and that "[t]here is no evidence that there was any kind of coercion. I mean, these are people who were willing to accept huge sums of money." (*Id.*)

The prosecutor argued that the prior offenses showed "a common plan or scheme" and that petitioner "has a disposition to commit sexual offenses," and then described the § 1108 evidence this way:

> All the prior offenses involve the same, like, 3,000-foot view similarities: prepubescent girls; there's grooming and manipulation; there's infatuation; and then there is vaginal touching, oral copulation, and photography. [¶] Those things are also here in the current case, that same sort of grooming process, not just of the victim, but also

> of the people around the victim. There's that same infatuation and those same sexual acts.

(13RT 1741-42.) He added: "You know he did those things with one objective and one consequence back in 2006, 2005. He's done it again in the present case, done the same things for the same reasons with the same results." (13RT 1744.) Neither Hailee nor Kasey had described oral copulation or photography. (6RT 395-431, 433-48.) Defense counsel did not object. (Opn. 9.)

In rebuttal, when the defense could no longer respond, the prosecutor argued again that the § 1108 evidence supported Doe's credibility and again recounted its details. (13RT 1800.) He asked, "Where is the suggestibility to prompt that disclosure? There is nothing in the evidence to show where that would come from." (13RT 1801-02.) He then answered the suggestion defense with the expert, three times: "Dr. Urquiza talked about suggestibility. He did not say that suggestibility is high at five to six. He said by five to six, the kids are too old. It's not a problem. It's preschoolers who you have to worry about this." (13RT 1803-04.) "[Jane Doe] is seven when she is testifying. She is six and a half when she did her interview with Detective Yates. Per Dr. Urquiza, suggestibility is not an issue at that point." (13RT 1804.) "To the extent you have to worry about it, the ten-

step protocol protects against that step of informing them. . . . Detective Yates went through those steps." (*Id.*) He told the jury it did not "need to know their exact level of financial support" or "the exact date of the first disclosure" (*id.*), and that the blackmail defense was "a lot of setup with no punchline" (13RT 1805).

Defense counsel put the four-day gap to the jury: "Mom supposedly talked to [Jane Doe] in the park on the 4th or 5th of November, and [Jane Doe] didn't talk to Detective Yates until days after that. Was Mom discussing anything with [Jane Doe] during that time period or not?" (13RT 1756.)

The defense theory was that Natalie knew the details of the Autumn case and used them to blackmail petitioner, who "was an easy target for blackmail" because of his prior convictions. (13RT 1748, 1759, 1768, 1775-78, 1785.) Petitioner had told James he "would kill himself before he'd go back" to prison. (10RT 1184.)

**I. The Investigation of the Blackmail Defense and the Walds' Gain**

Detective Yates asked Sergeant Cantrall to look for evidence of blackmail. (11RT 1502-03.) Petitioner had told the detectives about a $10,000 cash withdrawal from his account and asked them to look for a matching deposit in Natalie's account. (11RT 1507-08.) Detective Yates

did not recall passing that on. (10RT 1223; 11RT 1508.) Cantrall found large cash withdrawals from petitioner's personal account but never determined where the cash went. (10RT 1256-58.) He traced approximately $117,000 in payments out of the Entertainment Technology account to James and Natalie Wald. (10RT 1240.) He reviewed 5,933 pages of petitioner's bank records and 411 pages of credit card records for payments to the Walds and to the church, and "[n]othing else." (10RT 1224, 1231.) Asked whether he had obtained the Walds' bank records to see whether a withdrawal from petitioner's account reappeared as a deposit in theirs, he answered, "I didn't look at their accounts," and he agreed the records could have been obtained by warrant or by consent. (10RT 1237-38.) The defense investigator reviewed the same records and identified approximately $70,000 in checks written to James Wald that were signed by Natalie Wald, who was not an authorized signer on the account. (10RT 1233-35; 12RT 1652-56; 4CT 931-32.) He also identified $10,430.60 in further payments on two other accounts (12RT 1657; 4CT 934), a $12,011.25 payment to the children's school in June 2020 annotated "Wald 2020 to 2021 tuition," and six $2,000 electronic payments from petitioner's Airlink account to the school between May and November 2021 (12RT 1658). In rebuttal the prosecutor told the jury that Cantrall "concluded no evidence of illegal

payments." (13RT 1805.) Petitioner was arrested on November 12, 2021. (11RT 1492.) Within days, James began taking steps to buy Entertainment Technology. (9RT 960-61; 10RT 1160-64.) By trial he owned all of it. (9RT 1085.)

Natalie testified that she and James had not tried to get a loan to buy the company after the arrest (9RT 960), but James testified they had (10RT 1163). She testified that during trial she had communicated with no one in the courtroom other than the prosecutor and the victim advocate (9RT 947-48), but a spectator told the court she had texted Natalie about five times during the trial from the gallery (9RT 951-53). Natalie, herself a victim of childhood molestation (9RT 964, 1057), a mandated reporter (8RT 787; 9RT 962-63), and aware that petitioner was a registered sex offender (8RT 792; 9RT 944, 1026), nonetheless allowed him a great deal of time alone with her children (9RT 987), including after the 2019 statement (8RT 808).

**J. Deliberations and Verdict**

The jury retired to deliberate at 3:57 p.m. on Thursday, September 29, 2022. (2CT 553.) On Friday, September 30, it sent a note at 9:41 a.m. and a second note at 11:49 a.m. requesting a re-reading of Doe's testimony. (2CT 556-558, 563.) The court reporter entered the jury room at 1:36 p.m. and concluded the read-back of Doe's entire testimony at 3:13 p.m. (2CT 563.)

The jury recessed at 4:02 p.m. without a verdict. (2CT 563.) It resumed at 9:07 a.m. on Monday, October 3, informed the court at noon that it had reached verdicts, and returned them at 1:37 p.m., the third day of deliberations. (3CT 627.)

## IX. GROUNDS FOR RELIEF

Each ground below was fairly presented to the California Supreme Court and is exhausted. The facts supporting each ground are set out in the Statement of Facts, Section VIII, which is incorporated into each ground. The legal argument supporting each ground is set out in the accompanying Memorandum of Points and Authorities.

### A. Ground One: The Admission of the CSAAS Testimony and the CALCRIM No. 1193 Instruction, as Applied at Petitioner's Trial, Violated His Sixth and Fourteenth Amendment Rights to Due Process and a Fair Trial

The admission of expert testimony on Child Sexual Abuse Accommodation Syndrome, together with the CALCRIM No. 1193 instruction that authorized the jury to use that testimony "in evaluating the believability of" the complaining witness, rendered petitioner's trial fundamentally unfair in violation of the Due Process Clause of the Fourteenth Amendment and his Sixth Amendment right to a fair trial by

jury. This ground does not contend that CSAAS testimony is unconstitutional in every trial. It contends that at this trial, where Doe's testimony was the prosecution's entire case (13RT 1799), the testimony was admitted from an expert who conceded that the syndrome assumes abuse occurred and cannot identify who has been abused (8RT 715-16, 730), the instruction directed the jury to use it in deciding whether Doe was believable (13RT 1718-19), and the prosecutor told the jury to do exactly that (13RT 1738), the evidence supported no permissible inference on the only contested issue and operated as proof of guilt.

Supporting facts: The CSAAS testimony, including Dr. Urquiza's concessions that CSAAS is not a diagnosis, cannot identify abused children, and was derived from children already known to have been abused, his statement that the number of false allegations is "fairly low," and his acknowledgment that his reassurance about suggestibility was confined to the forensic interview and that little is known about what precedes it, is set out at Section VIII.G. The CALCRIM No. 1193 instruction as orally delivered and as written, the prosecutor's closing argument directing the jury to use the CSAAS testimony to evaluate Doe's credibility and applying the syndrome to her component by component, and his rebuttal attributing to the expert the propositions that suggestibility was not an issue and that the ten

step protocol protected against it, are set out at Section VIII.H. The two years of repeated questioning, the forensic interview, and the other evidence bearing on Doe's credibility and on prejudice are set out at Sections VIII.B through VIII.E, VIII.I, and VIII.J.

Exhaustion: Petitioner presented this ground on direct appeal (AOB 2-3, 42-53) and in his petition for review (PFR 9, 20-32). The California Supreme Court denied review on August 21, 2024.

Procedural posture: The Court of Appeal decided the CSAAS and instruction claims on the merits under state law without invoking forfeiture or any other procedural rule, and without addressing the federal dimension of the claim. (Opn. 11-13.) No procedural default is available to respondent. *Huffman v. Ricketts*, 750 F.2d 798, 801 (9th Cir. 1984). The standard of review is addressed in the Memorandum, Section II and III.B.

**B. Ground Two: The Prosecutor's Misstatement of the Section 1108 Evidence in Closing Argument Violated Petitioner's Fourteenth Amendment Right to Due Process**

In closing argument, the prosecutor told the jury that "[a]ll the prior offenses" involved "vaginal touching, oral copulation, and photography," and that "those same sexual acts" were present in this case. (13RT 1741-42.) That was false as to two of the three prior accusers. Neither Hailee nor

Kasey described oral copulation or photography. (6RT 395-431, 433-48.) The Court of Appeal so found. (Opn. 9.) The misstatement attributed to the uncharged allegations the two acts that defined the charged offenses, manufactured a uniform pattern the record did not contain, bolstered Doe's credibility on the specific acts she described, and erased the distinction on which the blackmail defense rested, namely that only the publicized Autumn case resembled the charged conduct. In a trial in which Doe's testimony was the prosecution's entire case (13RT 1799), the misstatement so infected the trial with unfairness as to make the resulting conviction a denial of due process.

Supporting facts: The prosecutor's statements and their repetition in rebuttal, the testimony of the three prior accusers, the Court of Appeal's finding that the prosecutor misstated the evidence, the defense theory, and the evidence bearing on prejudice are set out at Sections VIII.F, VIII.H, VIII.I, and VIII.J.

Exhaustion: Petitioner presented this ground on direct appeal (AOB 36-41) and in his petition for review (PFR 9, 17-20). The California Supreme Court denied review on August 21, 2024.

Procedural posture: The Court of Appeal held the claim forfeited for lack of a trial objection and, in the alternative, adjudicated the federal claim

on the merits, holding the misstatement harmless "under both federal and state constitutional standards." (Opn. 9-10.) The Court's order of June 9, 2026, directs that any contention of procedural default be raised in the answer. (Dkt. 7 at 2 n.1.) If respondent asserts a default, petitioner will address the independence and adequacy of the asserted bar and any applicable exception in his reply. The state court's alternative merits ruling is addressed in the Memorandum, Section IV.

**C. Ground Three: The Admission of the Evidence Code Section 1108 Propensity Evidence, as Applied at Petitioner's Trial, Violated His Sixth and Fourteenth Amendment Rights to Due Process and a Fair Trial**

The admission of propensity evidence under Evidence Code § 1108, as applied at this trial, rendered the proceedings fundamentally unfair in violation of the Due Process Clause of the Fourteenth Amendment and the Sixth Amendment right to a fair trial. Three features of the evidence combined to produce that result. First, the jury heard live, emotionally charged testimony from Autumn F. about offenses that were already before it through petitioner's recorded confessions, the prosecutor's opening statement, and the parties' stipulation to his convictions. (2CT 322-82; 4CT 891; 6RT 363, 381, 383, 451; 10RT 1306.) Second, the jury heard

uncharged allegations by Hailee G. and Kasey N. from 2006, some sixteen years before trial, that petitioner denied, that were never charged, that were uncorroborated, and that did not involve oral copulation or photography. (2RT 104; 6RT 395-448; 7RT 518.) Third, the prosecutor's closing argument erased those dissimilarities by telling the jury that all of the prior offenses involved oral copulation and photography. (13RT 1741-42.) Evidence Code § 352 is the safeguard on which the constitutionality of § 1108 depends. *People v. Falsetta*, 21 Cal. 4th 903, 916-17 (1999). Here that safeguard failed, and the jury was invited to convict on the strength of who petitioner was in 2006 rather than on proof of what he did between 2019 and 2021.

Supporting facts: The pretrial objections and ruling, the testimony of Autumn, Hailee, and Kasey, the confessions, stipulation, and opening statement, the prosecutor's closing argument, the defense theory, and the evidence bearing on prejudice are set out at Sections VIII.F, VIII.H, VIII.I, and VIII.J.

Exhaustion: Petitioner presented this ground on direct appeal (AOB 19-36) and in his petition for review (PFR 9, 10-17). The California Supreme Court denied review on August 21, 2024. Respondent's motion to dismiss did not contest the exhaustion of this ground. (Dkt. 9 at 8.)

Procedural posture: The Court of Appeal adjudicated the claim on the merits. (Opn. 7-9.) The standard of review is addressed in the Memorandum, Sections II and V.

## X. PRAYER FOR RELIEF

WHEREFORE, petitioner respectfully requests that this Court:

1. Issue a writ of habeas corpus vacating the judgment of conviction entered on November 8, 2022, in Ventura County Superior Court case no. 2021029627, and ordering petitioner's release unless the State of California retries him within a reasonable period to be fixed by this Court.

2. In the alternative, order respondent to show cause why the relief sought should not be granted, and, if the Court finds that 28 U.S.C. § 2254(d) is satisfied or that review is de novo, or if the Court treats the scientific literature cited herein as evidence rather than as legislative fact, conduct an evidentiary hearing under Rule 8 of the Rules Governing Section 2254 Cases.

3. Deny respondent's motion to dismiss (Dkt. 9) as moot.

4. Grant such other and further relief as the Court deems just and proper.

Dated: August 31, 2026

Respectfully submitted,

ZARMI LAW

By: /s/ David Zarmi
DAVID ZARMI
Attorney for Petitioner
TRAVIS EDWARD MARTIN

## VERIFICATION

I, David Zarmi, declare as follows:

1. I am an attorney licensed to practice law in the State of California and admitted to practice before this Court, and I am counsel of record for petitioner Travis Edward Martin in this action.

2. I make this verification on behalf of Mr. Martin because he is incarcerated in San Diego County, a location different from that of my office, and because the matters stated in this petition are drawn from the state court record and are more within my knowledge than his. 28 U.S.C. § 2242.

3. Mr. Martin has reviewed this First Amended Petition and has authorized me to represent him in this action and to sign, verify, and file it on his behalf.

4. I have reviewed the state court record cited in this First Amended Petition and supervised its preparation, and I declare that its contents are true to the best of my knowledge and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 31, 2026, at Beverly Hills, California.

/s/ David Zarmi
DAVID ZARMI

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The prosecution's case was the testimony of a seven-year-old about events alleged to have begun when she was four. There was no physical evidence and no eyewitness. The only adult to whom Jane Doe ever disclosed was her mother, who had asked her about "licking" every few weeks for two years and received a denial every time, who days earlier had told petitioner that "[o]ne phone call is all it will take," and who called the police two days after petitioner ended her paid role in his company. The jury asked to hear Doe's testimony again before it convicted.

Into that credibility contest the State introduced testimony about Child Sexual Abuse Accommodation Syndrome from an expert who knew nothing about the case and who conceded that the syndrome describes children already known to have been abused and cannot identify who has been abused. The court then told the jury it could use that testimony "in evaluating the believability of" Doe, and the prosecutor told the jury to do exactly that. The prosecutor also told the jury, falsely, that all three prior accusers had described the two acts that defined the charged offenses, oral copulation and photography. And the jury heard those accusers: one whose account was already established by confession and conviction, and two

whose sixteen year old allegations were never charged and never resembled the charged conduct.

*Andrew v. White*, 604 U.S. 86 (2025), confirms that the rule of *Payne v. Tennessee*, 501 U.S. 808, 825 (1991), that evidence "so unduly prejudicial that it renders the trial fundamentally unfair" violates due process, is clearly established federal law. The federal decisions rejecting CSAAS claims rested on the contrary premise or on cautionary instructions this jury never received. The three grounds pled here are exhausted, each bears on the single credibility determination that decided this case, and each warrants relief.

## II. STANDARD OF REVIEW

Where a state court adjudicated a federal claim on the merits, relief requires a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or that "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(1), (2). Clearly established law means the holdings of the Supreme Court at the time of the state decision, *Williams v. Taylor*, 529 U.S. 362, 412 (2000), and "[g]eneral legal principles can constitute clearly established law for purposes of AEDPA so long as they are holdings of th[e] Court." *Andrew*, 604 U.S. at

94. An application of law is unreasonable when it is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). This Court looks through the California Supreme Court's summary denial to the Court of Appeal's reasoned opinion. *Wilson v. Sellers*, 584 U.S. 122, 125-26 (2018).

Two limits on deference matter here. First, deference applies only to claims "adjudicated on the merits." When a state court addresses some issues but not the federal claim, a rebuttable presumption arises that the federal claim was adjudicated, but the presumption is overcome when "the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court," and the petitioner is then entitled to "an unencumbered opportunity to make his case before a federal judge." *Johnson v. Williams*, 568 U.S. 289, 301-03 (2013). Second, a state court finding that "plainly misapprehend[s] or misstate[s] the record" on a material issue is unreasonable under § 2254(d)(2), and a petitioner who satisfies either subsection of § 2254(d) is entitled to de novo review. *Marks v. Davis*, 106 F.4th 941, 949-50 (9th Cir. 2024).

Relief also requires that the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v.*

*Abrahamson*, 507 U.S. 619, 637 (1993). A court in "grave doubt" about harmlessness must treat the error as harmful. *O'Neal v. McAninch*, 513 U.S. 432, 435-36 (1995). Where the state court adjudicated harmlessness, the petitioner must satisfy both *Brecht* and § 2254(d). *Brown v. Davenport*, 596 U.S. 118, 122, 134 (2022). Where it did not, *Brecht* alone governs. *Bradford v. Paramo*, 100 F.4th 1088 (9th Cir. 2024). The *Brecht* inquiry considers the error's effect against the whole record, *Kotteakos v. United States*, 328 U.S. 750, 765 (1946), including the other errors that operated on the same issue, *Parle v. Runnels*, 505 F.3d 922, 927-28 (9th Cir. 2007). Petitioner pleads no freestanding cumulative error claim.

## III. GROUND ONE: THE CSAAS TESTIMONY AND CALCRIM NO. 1193, AS APPLIED, RENDERED THE TRIAL FUNDAMENTALLY UNFAIR

### A. Payne Is Clearly Established Law After Andrew v. White

In *Payne*, the Supreme Court held that where "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." 501 U.S. at 825. In *Andrew*, the Court held that this principle was "indispensable to the decision in *Payne*" and is therefore "a holding of th[e] Court for purposes of AEDPA." 604 U.S. at 92. The absence of a

Supreme Court case with identical facts is no obstacle. *Id.* at 94; *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). *Andrew* also identified the questions on which the merits turn: the relevance of the disputed evidence, the degree of prejudice from its introduction, and whether the trial court gave mitigating instructions. 604 U.S. at 96.

Respondent will cite *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009), which rested on the premise that the Supreme Court had "not yet made a clear ruling" that the admission of prejudicial evidence can violate due process. *Andrew* supplied that ruling. Where intervening Supreme Court authority is "clearly irreconcilable" with circuit precedent, a district court must treat the circuit precedent as overruled. *Miller v. Gammie*, 335 F.3d 889, 893, 900 (9th Cir. 2003) (en banc). Petitioner does not overread *Andrew*. The decision does not address CSAAS testimony, and *Estelle v. McGuire*, 502 U.S. 62 (1991), stands undisturbed. What *Andrew* settles is the rule: evidence admitted for a limited purpose but used as proof of guilt, on the only contested issue, from which no permissible inference could be drawn, is measured against *Payne*.

### B. The State Court Overlooked the Federal Claim, So Review Is De Novo, and Its Ruling Was Unreasonable in Any Event

Petitioner presented the CSAAS and instruction claims to the Court of Appeal and the California Supreme Court as violations of the Sixth and Fourteenth Amendments, in the headings and the body of the argument. (AOB 2-3, 42-53; PFR 9, 20-32.) The Court of Appeal answered the evidentiary claim with *People v. Kelly*, 17 Cal. 3d 24 (1976), and *People v. Munch*, 52 Cal. App. 5th 464 (2020), and the instructional claim with *People v. Gonzales*, 16 Cal. App. 5th 494 (2017). (Opn. 11-13.) It cited no federal case, mentioned no federal constitutional provision, and used none of the vocabulary of due process. (*Id.*) In the same opinion, addressing the prosecutorial misconduct claim, the court expressly adjudicated the federal claim "under both federal and state constitutional standards." (Opn. 10.)

That contrast rebuts the *Johnson* presumption. The presumption rests on the premise that a state court applying a state standard at least as protective as the federal one has necessarily decided the federal claim. 568 U.S. at 298-301. The state standards applied here are not. *Kelly* asks whether evidence rests on a new scientific technique. *Gonzales* asks how a reasonable juror reads the instruction in the abstract. Neither asks whether the evidence as used at this trial rendered it fundamentally unfair, and

neither asks whether the instruction, read with the arguments of counsel, created a reasonable likelihood that the jury applied it unconstitutionally. A court that decides the federal claim on one issue and says nothing about it on the next has "inadvertently overlooked" the second. *Johnson*, 568 U.S. at 303. Review is de novo.

*Kipp v. Davis*, 971 F.3d 939, 950-51 (9th Cir. 2020), applied the presumption where the state court decided only Evidence Code §§ 1101 and 352 questions, because of the "overlapping nature" of those questions and the due process claim. The *Kelly* inquiry does not overlap. Whether CSAAS rests on a novel scientific technique says nothing about whether its use at this trial was fair.

If § 2254(d) applies, it is satisfied. The Court of Appeal's instructional ruling rests on a determination that CALCRIM No. 1193 leaves "the parties free to argue and the jury to determine what the conduct may mean, including that the behavior, such as delay in reporting, could be indicative of falsehood." (Opn. 12-13.) That is a statement about how the instruction operated at this trial, and the record refutes it. The prosecutor told the jury how to use the expert's testimony: "He talked to you about how child sexual abuse victims act and how they behave. You can use that in evaluating her credibility." (13RT 1738.) Two years of denials became,

under that direction, the behavior of an abused child rather than evidence of a false accusation. And in rebuttal the prosecutor foreclosed the falsehood inference expressly, attributing to the expert assurances he never gave. (13RT 1803-1804; Section III.C, infra.) A ruling that never identifies the *Payne* principle and rests on a premise the transcript contradicts is both an unreasonable application of clearly established law and an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1), (2); *Marks*, 106 F.4th at 950-51.

**C. As Applied, the Evidence and the Instruction Operated as Proof of Guilt on the Only Contested Issue**

Due process forbids the admission of evidence from which "no permissible inferences" can be drawn on the issue for which it is offered. *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (applying *Estelle* and *Dowling v. United States*, 493 U.S. 342, 352 (1990)). The question is never whether the evidence complied with state law but whether its admission "rendered the trial so arbitrary and fundamentally unfair that it violated federal due process." *Id.* at 920-21. Flawed expert testimony is within the rule. *Gimenez v. Ochoa*, 821 F.3d 1136, 1145 (9th Cir. 2016).

California permits CSAAS testimony for one purpose: to disabuse jurors of misconceptions about how abused children behave, so that a delay

in reporting or a recantation is not treated as necessarily inconsistent with abuse. *People v. McAlpin*, 53 Cal. 3d 1289, 1300-01 (1991). California forbids its use to prove that abuse occurred or that the child is telling the truth, because "CSAAS assumes a molestation has occurred and seeks to describe and explain common reactions of children to the experience." *People v. Bowker*, 203 Cal. App. 3d 385, 393-94 (1988); *Munch*, 52 Cal. App. 5th at 468. The People's expert agreed. The syndrome is not a diagnosis, cannot identify who has been abused, and was derived from "kids who had been abused." (8RT 715-16, 730.)

At this trial the permitted use and the forbidden use were the same thing. Doe's testimony was the prosecution's entire case. (13RT 1799.) Her credibility was the contested issue, and the impeachment was substantial: a recanted first statement, at least forty one denials, and a disclosure elicited by her mother days after a threat and a severed paid role. (Section VIII, supra; Section VI, infra.) The evidence did not stop at explaining behavior. The expert told the jury that "[t]he number of children who have made false allegations of sexual abuse is fairly low." (8RT 741.) On the only contested issue, the State's expert supplied a base rate. The instruction told the jury it could use the syndrome "in evaluating the believability of her testimony." (13RT 1718-19.) The prosecutor told the

jury to do so, and then applied the framework to Doe component by component, down to the recantation: "She told you, 'My mom didn't believe me the first time I told her.' So what's [Jane Doe] supposed to do? Why tell again?" (13RT 1738-39.) A juror who followed those directions used the syndrome to decide whether Doe's denials, delay, and recantation meant what they ordinarily mean. Because the syndrome assumes abuse, the only inference it offers on that question is that the behavior is what abused children do, and therefore that Doe was abused. That is the inference California forbids and the one the instruction and the argument invited. Evidence that supports only an impermissible inference, admitted under an instruction directing the jury to draw it, is the *Payne* and *Jammal* case. Expert testimony carries particular weight with lay jurors, and "some toxins can be deadly in small doses." *Buck v. Davis*, 580 U.S. 100, 122 (2017).

The testimony also broke the promise on which it was admitted. (1CT 239-240; Section VIII.G, supra.) There is "no meaningful distinction between giving a statistic that indicates that false allegations are rare and stating that children rarely make false allegations without explicitly quantifying the word 'rare,'" because either way "the expert is vouching for the veracity of the" complaining witness. *People v. Lapenias*, 67 Cal. App. 5th 162, 179-80 (2021). The same expert's testimony on the same subject

required reversal in *People v. Julian*, 34 Cal. App. 5th 878, 885-87 (2019), where the division that later affirmed this judgment held that it deprived the defendant of a fair trial, and its admission was an abuse of discretion in *People v. Wilson*, 33 Cal. App. 5th 559, 568-71 (2019).

The instruction did not cure the problem. It was the mechanism. An instruction violates due process when, read in the context of the whole charge and the arguments of counsel, there is "a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Estelle*, 502 U.S. at 72 (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)); *Middleton v. McNeil*, 541 U.S. 433, 437-38 (2004) (per curiam) (argument of counsel bears on how jurors understood an instruction). Three features of CALCRIM No. 1193 as given create that likelihood. First, the contradiction. On the written text the Court of Appeal quoted, the first sentence says the testimony is not evidence that petitioner committed the charged crimes, and the second authorizes its use to evaluate the believability of the one witness whose testimony was the proof of those crimes. (Opn. 11 n.5.) As orally delivered, the charge was narrower still: the jury was told only that the testimony "is not evidence that the defendant committed any other crimes charged against him or any conduct or crimes with which he was not charged." (13RT 1719.) The one version the jury

heard aloud never excluded use of the testimony as evidence of the crimes actually charged. "Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity." *Francis v. Franklin*, 471 U.S. 307, 322 (1985). Second, the instruction runs one way. It supplies the innocent explanation for delay, denial, and recantation and says nothing of the competing inference that the same conduct evidences fabrication. An instruction that restricts the jury's use of evidence in the defendant's favor while leaving the prosecution's use unimpeded violates due process. *Cool v. United States*, 409 U.S. 100, 102-04 (1972) (per curiam). Third, the double negative. "Not inconsistent with" means consistent with, and using the expert's framework to decide whether Doe's conduct was consistent with that of a molested child is diagnosis by another name. The Judicial Council removed the phrase from the pattern instruction in September 2022, after appellate panels had described it as potentially misleading, and added language confining the testimony to explaining the alleged victim's behavior. *People v. Page*, 114 Cal. App. 5th 1022, 1030-31 (2025) (describing the Judicial Council report of Sept. 20, 2022); *see* Opn. 12 n.6. This jury was charged with the old text days after the revision was approved. The *Page* majority holds the two phrasings equivalent, *id.* at 1032-33, and a member of the panel warned that either

"could be understood by a jury to mean that reporting anomalies indicate that the abuse in fact occurred." *Id.* at 1036 (Kelety, J., concurring).

*Gonzales* reasons that a juror who believes the expert will find that Doe's self impeaching behavior "does not affect her believability one way or the other." 16 Cal. App. 5th at 504. That is the problem, not the answer. Whether forty one denials affect a child's believability is the jury's question. An instruction that answers it, in the State's favor, with the authority of an expert who assumed the abuse he was describing, relieves the State of its burden to prove the contested element through rationally probative evidence. *In re Winship*, 397 U.S. 358, 364 (1970); *Sullivan v. Louisiana*, 508 U.S. 275, 278-79 (1993). Timing compounded the defects. No limiting instruction accompanied Dr. Urquiza's testimony when it was given, although California requires one sua sponte in every CSAAS case, *People v. Housley*, 6 Cal. App. 4th 947, 958-59 (1992), and the testimony stood unrestricted until the final charge. (8RT 707-47; 13RT 1718-19.)

The rebuttal completed the misuse. The prosecutor told the jury that at five to six "the kids are too old. It's not a problem," that "[p]er Dr. Urquiza, suggestibility is not an issue at that point," and that "the ten-step protocol protects against" what happened before the interview. (13RT 1803-04.) The expert had said none of that. He confined the protocol to the

forensic interview and twice disclaimed any knowledge of what precedes it. (8RT 741-42, 745-46.) Argument that "manipulate[s] or misstate[s] the evidence" is what *Darden v. Wainwright*, 477 U.S. 168, 182 (1986), condemns, and the state court's premise that this jury remained free to read Doe's denials as falsehood (Opn. 12-13) cannot survive a rebuttal that foreclosed the inference on the expert's authority.

**D. Brodit and the Cases That Follow It Do Not Control**

*Brodit v. Cambra*, 350 F.3d 985 (9th Cir. 2003), rejected a CSAAS due process claim under AEDPA on a record that is the inverse of this one. The jury there was instructed that the CSAAS testimony "is not received and must not be construed by you as proof that the alleged victim's molestation claim is true," and that the underlying "research begins with the assumption that a molestation has occurred," while "you are to presume the defendant innocent." *Id.* at 991 & n.1. On the strength of those warnings, and because the testimony did not preclude the defense from attacking the child's credibility, the court found no fundamental unfairness. *Id.* at 991. Neither warning was given here. CALCRIM No. 1193 omits the prohibition, conceals the assumption, and substitutes an affirmative license to use the syndrome in evaluating believability. (13RT 1718-19.) And the prosecutor, far from leaving the defense free to attack Doe's credibility with her denials

and recantation, applied the framework to Doe fact by fact in closing and answered the suggestion defense in rebuttal with propositions he attributed to the expert. (13RT 1738-39, 1803-04.) *Brodit* remains binding on its facts. On its facts it condemns this record.

The later cases add nothing. *Amaya v. Frauenheim*, 823 F. App'x 503 (9th Cir. 2020), is unpublished and rested on *Holley*'s premise that no clearly established law governed prejudicial evidence. *Bredemeier v. Phillips*, 786 F. Supp. 3d 1300 (C.D. Cal. 2025), an early post-*Andrew* decision, rejected a theory this petition does not advance, a freestanding right to the exclusion of unreliable expert evidence, on a record in which limiting instructions accompanied the challenged evidence, no prosecutorial misuse was alleged, and the jury acquitted on a count. *Id.* at 1313-14, 1331-33. *Bredemeier* also recognized that *Holley* and the pre-*Andrew* cases built on it "are thus likely abrogated now." *Id.* at 1319 n.12. None of those features is present here. *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012), rests on the ordinary safeguards, cross examination and argument. Here the instruction withdrew them: the jury was told to evaluate the very tools by which it would test a witness, her denials and her recantation, through a framework that assumed her account was true.

Nor does the most recent authority. *Andrew v. Tinsley*, 164 F.4th 789, 799-802 (10th Cir. 2026), *reh'g en banc denied* (Aug. 14, 2026), denied relief on remand because the challenged evidence did not coincide precisely with the central question and the properly admitted evidence of guilt was overwhelming. Here there was no physical evidence, no eyewitness, and syndrome evidence bearing precisely on the dispositive issue. *Martinez v. Quick*, 134 F.4th 1046 (10th Cir. 2025), turned on brief, unexpected penalty phase testimony that the trial court immediately instructed the jury to disregard and that the prosecution never mentioned again. Here the testimony came from the State's own expert, no curative word was spoken, and the prosecutor built his closing and rebuttal on it.

**E. The Scientific Literature Confirms the Prejudice**

The literature is cited as legislative fact and legal authority, in the manner in which courts consult professional literature when defining what a constitutional rule requires, *Hall v. Florida*, 572 U.S. 701, 710-14 (2014), and not as new evidence. The claim is complete on the state court record. Review under § 2254(d) is confined to that record, *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011), which includes the People's in limine motion and the full trial transcript. Should the Court treat the later literature as evidence, *Pinholster* does not restrict review once § 2254(d) is satisfied or review is de

novo. *See id.* at 185 (§ 2254(e)(2) "continues to have force where § 2254(d)(1) does not bar federal habeas relief"). The literature confirms why the record shows prejudice.

CSAAS began as a clinical description of children already believed to have been abused. Summit, *The Child Sexual Abuse Accommodation Syndrome*, 7 Child Abuse & Neglect 177 (1983). Its "Sources and Validity" section describes no study. It draws on "correlations and observations that have emerged as self-evident" within treatment programs, with validity tested by "strong endorsements from experienced professionals and from victims." *Id.* Its sole claim about the rarity of false allegations, that "no more than two or three per thousand" children have been found to invent them, is sourced to a personal communication rather than to any study. *Id.*, Conclusion & ref. 70 ("Giarretto, H. Personal communication, 1979"). Its author later acknowledged that "[t]here is no clinical method to distinguish 'valid' claims from those that should be treated as fantasy or deception," Summit, *Abuse of the Child Sexual Abuse Accommodation Syndrome*, 1 J. Child Sexual Abuse 153, 158 (1992), and that the syndrome assumes a molestation occurred, O'Donohue & Benuto, *Problems with Child Sexual Abuse Accommodation Syndrome*, 9 Sci. Rev. Mental Health Prac. 20, 25 (2012). Both sources were before the state courts. (AOB 45; PFR 22.) The

empirical literature that followed concluded that the data do not support the syndrome's claims that abused children typically deny abuse when asked and recant true allegations. London et al., *Disclosure of Child Sexual Abuse*, 11 Psychol. Pub. Pol'y & L. 194 (2005).

The rate of false allegations is unknown. O'Donohue et al., *The Frequency of False Allegations of Child Sexual Abuse*, 27 J. Child Sexual Abuse 459 (2018). CSAAS "is not an official diagnostic term and should not be used as evidence of a defendant's guilt." Weiss & Alexander, *Sex, Lies, and Statistics*, 41 J. Am. Acad. Psychiatry & L. 412 (2013). Neither the American Psychiatric Association nor the American Psychological Association has recognized it, and it appears in no edition of the DSM. *State v. J.L.G.*, 190 A.3d 442, 446 (N.J. 2018). After a full evidentiary hearing, New Jersey excluded the syndrome except as to delayed disclosure. *Id.*; *State v. G.E.P.*, 243 N.J. 362 (2020).

The effect on verdicts has been measured. In a controlled study, mock jurors who heard CSAAS expert testimony returned guilty verdicts in 64.9 percent of cases against 55.8 percent for a control. Denne et al., *The Effects of Evidence-Based Expert Testimony on Perceptions of Child Sexual Abuse Involving Recantation*, 16 PLoS ONE e0254961 (2021). Juror knowledge of syndrome consistent behaviors increases convictions through heightened

perceptions of the complainant's credibility, the very channel CALCRIM No. 1193 authorizes. Goodman-Delahunty et al., *Greater Knowledge Enhances Complainant Credibility and Increases Jury Convictions for Child Sexual Assault*, 12 Frontiers Psychol. 624331 (2021). And the behaviors the syndrome recasts as consistent with abuse appear at scale in convictions proven false: in the known exonerations for child sexual abuse, victim recantation appeared in 49.0 percent, delayed disclosure in 47.5 percent, and suggestive questioning in 21.8 percent. Denne et al., *Characteristics of Exonerated Cases of Child Sexual Abuse*, 17 Frontiers Psychol. 1794898 (2026).

Preschool children are disproportionately vulnerable to suggestion, and misinformation from parents before any formal interview produces false reports that young children do not retract. Bruck & Ceci, *The Suggestibility of Children's Memory*, 50 Ann. Rev. Psychol. 419 (1999); Poole & Lindsay, *Children's Eyewitness Reports After Exposure to Misinformation From Parents*, 7 J. Experimental Psychol.: Applied 27 (2001). Petitioner acknowledges that California permits properly limited CSAAS testimony. *Munch*, 52 Cal. App. 5th 464. The point is narrower: on a record in which the syndrome was applied, by instruction and argument, to the believability

of the only witness, the literature confirms that the effect was to raise the probability of conviction without regard to whether the accusation was true.

**F. Preserved Alternative Argument**

Petitioner preserves the broader argument that CSAAS testimony admitted under CALCRIM No. 1193 supports no permissible inference in any trial in which the complaining witness's credibility is the contested issue, because the syndrome assumes the abuse it is offered to prove, cannot distinguish true accusations from false ones, and is authorized by the instruction for use on the one question it cannot answer. *Jammal*, 926 F.2d at 920; *Gimenez*, 821 F.3d at 1145; *cf. Dowling*, 493 U.S. at 352-53. The Court need not reach that argument. The as-applied record described above establishes the violation without it.

## IV. GROUND TWO: THE PROSECUTOR'S MISSTATEMENT OF THE SECTION 1108 EVIDENCE VIOLATED DUE PROCESS

**A. Clearly Established Law**

A prosecutor's argument violates due process when it "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The inquiry considers the remarks in context, including whether they "manipulate[d] or

misstate[d] the evidence," the weight of the evidence, and the instructions given. *Id.* at 181-82. *Darden* marked the decisive line: the argument there was tolerable in part because it "did not manipulate or misstate the evidence." *Id.* at 182.

A prosecutor "may strike hard blows," but "he is not at liberty to strike foul ones," and "improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Berger v. United States*, 295 U.S. 78, 88 (1935). The standard is a general one, and AEDPA affords state courts leeway in applying it. *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (per curiam). Petitioner invokes no circuit test.

**B. The Misstatement**

After the jury was instructed, the prosecutor told it that "[a]ll the prior offenses involve" the same acts, "vaginal touching, oral copulation, and photography," and that "those same sexual acts" were present here. (13RT 1741-1742.) He returned to the pattern in rebuttal, when the defense could not respond. (13RT 1800.) The statement was false. Neither Hailee nor Kasey described oral copulation or photography. (6RT 395-431, 433-448.) The Court of Appeal found the fact. (Opn. 9.) That finding is presumed correct, 28 U.S.C. § 2254(e)(1), and binds respondent.

The misstatement was not incidental. Similarity is the engine of the propensity inference and was the basis on which the evidence was admitted and upheld. (2RT 108-109; Opn. 8.) "[A] propensity to commit one kind of sex act cannot be supposed, without further evidentiary foundation, to demonstrate a propensity to commit a different act." *People v. Earle*, 172 Cal. App. 4th 372, 399 (2009). Oral copulation was the core of counts 1 through 7. Photography was the basis of counts 8 and 9. By attributing both acts to every prior accuser, the prosecutor manufactured the two similarities the record lacked and did so on the two acts that mattered. The falsehood also struck the defense at its center.

The defense was that Natalie, who knew the publicized details of the Autumn case, supplied the accusation. (13RT 1748, 1759, 1768, 1775-78, 1785; 12RT 1617.) That theory depended on the jury seeing that only the Autumn case resembled the charged conduct. Telling the jury that two accusers with no connection to Natalie had described the same acts erased the distinction on which the defense rested and converted a single, contaminated accuser into the fourth voice in a chorus.

**C. The State Court's Alternative Merits Ruling Was Unreasonable**

Having found the misstatement, the Court of Appeal excused it as "circumscribed," reasoning that the prosecutor had only "slightly overstated

the similarity between prior and charged offenses," that CALCRIM No. 222 told jurors argument is not evidence, that the offenses "shared many similarities," that no misstatement was made as to Autumn, and that the § 1108 witnesses "lend credence" to Doe's account. (Opn. 10.) No fairminded jurist could accept that analysis on this record.

Section 2254(d)(2) supplies the most direct route. In *Kipp v. Davis*, 971 F.3d 939, 952-55 (9th Cir. 2020), the Ninth Circuit granted relief because the state court's finding of a "highly distinctive pattern" between prior and charged offenses credited the similarities while misstating and ignoring the dissimilarities the record contained. The finding here is the same defect in starker form. Calling the attribution of oral copulation and photography to accusers who described neither a "slight" overstatement inverts the record. The similarities the court did identify, grooming, age, and touching (Opn. 8), were the similarities the prosecutor was entitled to argue. The misstatement added the two he was not, and those two were the acts charged. A finding that plainly misstates the record on the material issue is unreasonable, and review of the claim is then de novo. *Marks*, 106 F.4th at 950-51.

The ruling is also an unreasonable application of *Darden*. The state court never asked the question *Darden* poses. It did not consider that the

misstatement went to the evidence's principal source of probative value, that it was repeated in rebuttal, that it inverted the very theory on which the prosecutor had obtained the evidence, or that the case turned on the credibility of a single child witness whose account the misstatement was engineered to corroborate. CALCRIM No. 222 does not answer those points. Correct general instructions do not cure a prosecutor's misstatement where they "do not in any way address 'the specific statements of the prosecutor.'" *Deck v. Jenkins*, 814 F.3d 954, 982 (9th Cir. 2016) (quoting *United States v. Weatherspoon*, 410 F.3d 1142, 1151 (9th Cir. 2005)). The instruction did not identify the misstatement or tell the jury what Hailee and Kasey had actually said.

A juror who did not independently recall their testimony had no means to detect the inaccuracy, and the prosecutor's summary of testimony the jury had heard fifteen days earlier is precisely the kind of statement jurors accept. (2CT 388, 390, 553.) The court's remaining rationale is circular. It reasoned that the misstatement was harmless because the § 1108 witnesses lend credence to Doe's account, but their capacity to corroborate her was exactly what the falsehood inflated.

**D. Forfeiture**

The Court of Appeal found the claim forfeited for lack of objection and then adjudicated the federal claim on the merits in the alternative. (Opn. 9-10.) The Court's order of June 9, 2026, directs that any contention of procedural default be raised in the answer. (Dkt. 7 at 2 n.1.) Petitioner will address the independence and adequacy of any asserted bar, and any applicable exception, if and when it is raised. The alternative merits ruling is in all events the decision to which § 2254(d) applies, *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989), and it does not survive that review.

## V. GROUND THREE: THE ADMISSION OF THE SECTION 1108 PROPENSITY EVIDENCE, AS APPLIED, RENDERED THE TRIAL FUNDAMENTALLY UNFAIR

*Payne* and *Andrew* supply the rule. Petitioner acknowledges the obstacles. *Estelle* expressly reserved whether a state law permitting propensity evidence violates due process, 502 U.S. at 75 n.5, and *Alberni v. McDaniel*, 458 F.3d 860, 866-67 (9th Cir. 2006), held on that basis that no clearly established law governed the question. *Andrew* does not decide the reserved question. What it decides is that *Payne*'s general rule is clearly established and applies, through § 2254(d)(1), to the facts of a particular trial. 604 U.S. at 92-96. This ground therefore does not contend that

Evidence Code § 1108 is unconstitutional. It contends that the evidence admitted under it at this trial, in combination and as used, crossed the line *Payne* draws. *See Spencer v. Texas*, 385 U.S. 554, 560-64 (1967); *Michelson v. United States*, 335 U.S. 469, 475-76 (1948) (propensity evidence "is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record").

California's own answer to the due process question is Evidence Code § 352. Section 1108 survives constitutional challenge only because § 352 "preserves the accused's right to be tried for the current offense," and the trial court's discretion to exclude propensity evidence is what "saves section 1108 from defendant's due process challenge." *People v. Falsetta*, 21 Cal. 4th 903, 916-17 (1999). Where that safeguard fails, the constitutional floor is reached. Three features of this record, together, show that it failed.

First, Autumn's live testimony. Her account was already before the jury through petitioner's recorded confessions, the prosecutor's opening statement, and the parties' stipulation to the resulting convictions. (2CT 322-382; 4CT 891; 6RT 363, 451; 10RT 1306.) What her testimony added was that the abuse was painful, that petitioner "betrayed" her "in such a cruel manner," that it was "sickening," and that it "twisted [her] mind." (6RT 381, 383.) None of that bore on whether petitioner molested Doe. Its

only function was emotional. *Falsetta* itself lists "the availability of less prejudicial alternatives," including "admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details," as factors the court must weigh. 21 Cal. 4th at 917. The Court of Appeal's answer, that the prosecution "was not obliged to rely solely on such antiseptic evidence" (Opn. 9), is a rule for the ordinary case, not a weighing of this one.

Second, the uncharged allegations. Hailee's and Kasey's accounts described events sixteen years earlier, when they were ten and six, that petitioner denied, that were never charged, and that no physical evidence or witness corroborated. (2RT 104; 6RT 395-448; 7RT 518.) Hailee's account surfaced after her mother and stepmother asked, around the time of the news about the Autumn allegations, whether anything had happened. (6RT 403; 12RT 1617.) The sisters discussed petitioner with each other. (6RT 445.) And neither described the acts that defined the charged offenses. (6RT 395-431, 433-48.) *Falsetta* identifies the danger: where uncharged offenses did not result in conviction, jurors may "be tempted to convict the defendant simply to punish him for the other offenses." 21 Cal. 4th at 917.

Third, the argument. Whatever probative value the uncharged allegations had depended on their similarity to the charged conduct. The

prosecutor supplied a similarity the record did not contain. (13RT 1741-42.) The prejudice of the propensity evidence and the prejudice of the misstatement cannot be separated. The misstatement is what made the propensity evidence do the work it did.

The Court of Appeal's ruling addressed each objection in isolation and found each insufficient: the offenses shared grooming, age, and touching, remoteness was offset by similarity, the jury could judge credibility, and the prosecution need not rely on antiseptic proof. (Opn. 8-9.) It never asked whether the totality, redundant and inflammatory testimony on an adjudicated prior, two remote and uncharged accusations lacking the charged conduct's distinguishing features, and a closing argument that erased the distinction, left petitioner with a trial about what he did between 2019 and 2021 rather than who he was in 2006. Measured against *Payne*'s rule, and against the *Andrew* considerations of relevance, prejudice, and mitigating instruction, that omission was an unreasonable application of clearly established law.

## VI. THE ERRORS WERE PREJUDICIAL UNDER BRECHT

The State bears the risk of doubt. *O'Neal*, 513 U.S. at 435-36. The question is not whether the evidence was sufficient but whether the errors

had a substantial influence on the verdict, and a court left in grave doubt must grant relief. *Id.*; *Brecht*, 507 U.S. at 637.

This case was close, and the jury said so. Its verdict rested on a single witness, seven years old at trial, testifying about events alleged to have begun at four. The jury retired on Thursday afternoon, deliberated through Friday, stopped for a ninety seven minute read-back of Doe's entire testimony, recessed for the weekend, and did not convict until Monday afternoon. (2CT 553, 556, 563; 3CT 627.) A request for readback of the complaining witness's testimony "suggest[s], at a minimum, that [her] credibility was a point of discussion and not easily resolved," *People v. Zaheer*, 54 Cal. App. 5th 326, 340 (2020), and lengthy deliberations "suggest a difficult case," *United States v. Velarde-Gomez*, 269 F.3d 1023, 1036 (9th Cir. 2001) (en banc) (quoting *United States v. Varoudakis*, 233 F.3d 113, 126 (1st Cir. 2000)).

The impeachment was substantial. Doe's first statement, at four, was recanted in tears and never reported by a mandated reporter. (8RT 802, 805-06.) Over the next two years she denied any licking at least forty one times in response to a pointed question from her mother, repeated questioning of the kind the People's own expert said a preschool aged child has the potential to answer suggestively. (8RT 735, 737, 810; 9RT 965-67.) The

disclosure came two days after petitioner ended her mother's paid role, days after her mother threatened that "[o]ne phone call is all it will take," and in response to a question about secrets at a park. (8RT 811-13, 829-30; 9RT 1028, 1031.) The questions came from a script written by a school dean and closed with a forced choice among named candidates, and the next day her mother directed her answers about petitioner, question by question, to the point of tears. (8RT 812-13, 829-30, 840-41.)

In the forensic interview four days later, having spent those days in her mother's company, Doe could not say why she was there, could not remember what happened, feared the detective would be mad at her, and described abuse dating to an age she could not remember at all. (8RT 836, 839; 2CT 404, 407, 413, 416, 424, 426; 7RT 561.) Her mother's testimony was contradicted by a courtroom spectator and by her own husband, and by trial her family owned petitioner's company. (9RT 947-53, 960, 1085; 10RT 1163.) The bank records the People gathered showed roughly $117,000 flowing to the Walds, and the investigator who combed them never looked at the Walds' accounts. (10RT 1237-1240.) "[C]hildren in an unstable environment, unsupervised, needing attention, questioned by authority figures, who received positive reinforcement for reporting

molestation . . . are vulnerable to reporting things that simply didn't happen." *People v. Saldana*, 19 Cal. App. 5th 432, 449 (2018).

Each error bore directly on that determination. The CSAAS testimony, deployed through the instruction and the argument, gave the jury an expert endorsed framework for crediting Doe despite the denials, the delay, and the recantation, and an expert's assurance that false allegations are "fairly low." (8RT 741.) The prosecutor ran the framework through Doe by name, told the jury her testimony "all by itself is sufficient to prove this case beyond a reasonable doubt if you believe her" (13RT 1738-40), and in rebuttal told it that "[p]er Dr. Urquiza, suggestibility is not an issue," that the jury did not "need to know their exact level of financial support," and that the blackmail defense was "a lot of setup with no punchline" (13RT 1804-05).

The misstatement told the jury that three prior victims had described her exact acts. The propensity evidence, made uniform by the misstatement, invited the jury to resolve its doubt about the charged conduct by reference to 2006. The prosecutor's reliance measures the force of the evidence, *Kyles v. Whitley*, 514 U.S. 419, 444 (1995), and the prosecutor built his closing on all three. (13RT 1738, 1741-44, 1800.)

Counts 8 and 9 show the mechanism in its purest form. The photographs depicted fecal matter and a rash, on a child whose rashes her mother acknowledged and whose pictures petitioner had twice offered to send her, and the People's own examiner found nothing else on twenty-three devices. (9RT 940, 1001-02, 1054; 11RT 1360, 1366, 1403, 1424, 1429, 1435-37; 12RT 1626.) The prosecutor conceded the images contain "a rash" and "a small piece of poop" and disputed only "the focus of those shots." (13RT 1736.) Whether those images were documentation or pornography turned entirely on whether the jury believed Doe's account of everything else. The errors supplied that belief. At a minimum, the record leaves grave doubt whether the jury would have returned the same verdicts absent the errors. Relief must reach every count.

## VII. CONCLUSION

Petitioner was entitled to a trial about what he allegedly did between 2019 and 2021. He received a trial in which the only witness to those events was evaluated through a syndrome that assumed her account was true, in which the jury was told falsely that three prior accusers described her exact acts, and in which two of those accusers described uncharged conduct from sixteen years earlier that never resembled the charges. Even so, the jury needed five days and a read-back to convict. The writ should issue.

Dated: August 31, 2026

Respectfully submitted,

ZARMI LAW

By: /s/ David Zarmi
DAVID ZARMI
Attorney for Petitioner
TRAVIS EDWARD MARTIN

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for petitioner Travis Edward Martin, certifies that the Memorandum of Points and Authorities contained in this document contains 6988 words, which complies with the word limit of L.R. 11-6.1.

Dated: August 31, 2026

Respectfully submitted,

ZARMI LAW

By: /s/ David Zarmi
DAVID ZARMI
Attorney for Petitioner
TRAVIS EDWARD MARTIN

## CERTIFICATE OF SERVICE

I certify that on August 31, 2026, I electronically filed the foregoing FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY (28 U.S.C. § 2254); MEMORANDUM OF POINTS AND AUTHORITIES with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record for respondent, Kenneth C. Byrne, Supervising Deputy Attorney General, Office of the Attorney General, 300 South Spring Street, Suite 1702, Los Angeles, California 90013, DocketingLAAWT@doj.ca.gov.

/s/ David Zarmi
DAVID ZARMI